IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER A. ABELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 10-1550 |
| | ) | |
| DISH NETWORK SERVICE, LLC, | ) | Judge McVerry |
| | ) | Magistrate Judge Mitchell |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I. Recommendation

It is respectfully recommended that the motion for summary judgment filed on behalf of the Defendant, DISH Network Service, LLC (ECF No. 30), be granted.

II. Report

Plaintiff, Peter A. Abels, brings this employment discrimination action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621-34 (ADEA) against the Defendant, DISH Network Service, LLC ("DISH"). He alleges that, when DISH construed his act of leaving work in the middle of his shift on February 26, 2009 while stating that he was "sick of the smoking" in the warehouse as an act of job abandonment and terminated his employment, it discriminated against him on the basis of his age (51).

Currently pending for resolution is a motion for summary judgment, brought on behalf of the Defendant. For the reasons that follow, the motion should be granted.

Facts

Abels was born on September 26, 1957. DISH hired Abels as a Field Service Specialist in the East Pittsburgh location in 2000 when he was 42 years old. In 2002, Warehouse Manager

Brian Manns ("Manns") invited Abels to join the warehouse team as an Inventory Specialist at the age of 43. (Abels Dep. at 6-7, 11-12.)[1] Manns promoted Abels to a Senior Inventory Specialist on September 14, 2002 when Abels was 44 years old. (Abels Dep. at 6, 14 & Ex. 5.) The promotion included a pay increase. (Abels Dep. at 15.) Abels worked under the supervision of Manns throughout his employment in the warehouse. (Abels Dep. at 17.)

In March 2003, DISH implemented a reduction in force ("RIF") that affected Senior Inventory Specialists (like Abels) as well as other positions. (Abels Dep. at 15-16 & Ex. 6; Verification of Brian Manns ¶¶ 3-4.[2]) Despite eliminating at least one younger employee as part of the RIF, DISH retained Abels, who was then 45 years old. (Verification of Brian Manns ¶ 5.) DISH states that, in fact, it retained the two oldest Inventory Specialists (ages 59 and 45) and terminated the youngest Inventory Specialist (age 19). (Verification of Brian Manns ¶ 6.)[3] Abels contends that "Mr. Wilson" (the general manager prior to Paul Pevornik) tried to get rid of him, but his supervisor (Manns), along with a woman named "Ginny" from Human Resources, supported him and he was not selected for the RIF. (Abels Dep. at 16, 22, 74.)

Manns rated 45 year-old Abels as "Effective" in 2003 and awarded Abels a pay raise of 3.6898%. (Abels Dep. at 16-17 & Ex. 7.) Manns rated 46 year-old Abels as "Exceeds Expectations" in 2004 and awarded Abels a pay raise of 5.5149%. (Abels Dep. at 18 & Ex. 8.) Manns rated 47 year-old Abels as "Exceeds Expectations" in 2005 and awarded Abels a pay raise of 3.0183%. (Abels Dep. at 19-20 & Ex. 10.) Manns rated 48 year-old Abels as "Meets

---

[1] Def.'s App. (ECF No. 33) Ex. A.
[2] ECF No. 37 Ex. 4.
[3] Defendant initially made these factual assertions relying on the verification of Jon Moon (ECF No. 33 Ex. F), but Plaintiff denied them (ECF No. 36 ¶¶ 5-7) based on his motion to strike Moon's verification (ECF No. 34). In response to the motion to strike, Defendant filed a motion for leave to substitute the verification of Jon Moon with the verification of Brian Manns (ECF No. 37), which Plaintiff indicated he did not oppose and that motion has been granted. Manns' verification contains the same statements as Moon's, in the same numbered paragraph order.

Expectations" in 2006 and awarded Abels a pay raise of 4.472%. (Abels Dep. at 21 & Ex. 11.) Manns rated 49 year-old Abels as "Meets Expectations" in 2007 and awarded Abels a pay raise of 3.5%. (Abels Dep. at 22-23 & Ex. 12.) Manns rated 50 year-old Abels as "Meets Expectations" in 2008 and awarded Abels a pay raise of 3.5%. (Abels Dep. at 23-24 & Ex. 13.) Abels considered these to be "good evaluations" and recognized that he had received pay increases every year. (Abels Dep. at 40-41 & Ex. 21.)

Abels' Complaints About Smoking

Abels, who disliked cigarette smoke, often complained about the Technicians smoking at the back door of the warehouse because he claimed the smoke would blow into the warehouse. (Abels Dep. at 28-31, 45 & Ex. 21.) In response to Abels' complaints, DISH created a designated smoking area, instructed the Technicians about appropriate smoking areas during morning All Team Meetings, in e-mails, and face-to-face with individual employees, as well as placing a "NO SMOKING" sign outside of the warehouse door. (Abels Dep. at 30, 47-48; Shawley Dep. at 27, 29-32;[4] Grubbs Dep. at 11-12, 24;[5] Manns Dep. at 32.[6])

Abels contends that his complaints did no good, that the "NO SMOKING" sign was not posted for eight years, that despite the sign DISH employees still smoked in undesignated areas such that the smoke came into the warehouse when the doors were open and that Manns stated that he never heard anyone speak to the employees about where they should smoke. (Abels Dep. at 44; Grubbs Dep. at 16, 21; Manns Dep. at 34.) However, it is noted that Manns stated that he did not attend the All Team Meetings where the smoking issue would have been raised. (Manns Dep. at 31-32.)

---

[4] ECF No. 33 Ex. D.
[5] ECF No. 33 Ex. E.
[6] ECF No. 33 Ex. B.

3

The Incident of December 28, 2006

On December 28, 2006, Eric Umsheld, a Quality Assurance Specialist, allegedly walked into the warehouse with a cigarette. An exchange between Umsheld and Abels ensued, during which Abels yelled at Umsheld and called him an "asshole." (Abels Dep. at 26-27, 30 & Ex. 15.) Abels admitted that his outburst was unprofessional. Abels received a written warning for yelling and using profanities as a result of this incident, although he refused to sign it.[7] Abels contends that Frank Grubbs, the installation manager, did not write him up for this incident. (Abels Dep. at 38; Grubbs Dep. at 18-22.) However, Defendant has not asserted that Grubbs was the person who wrote Abels up for the incident and thus Abels raises a dispute over an immaterial fact.[8] Abels also contends that such language was not unusual in the warehouse and points out that Umsheld was not written up for potentially causing a fire. (Abels Dep. at 26-31.) As explained below, these examples of quibbling with immaterial details and disagreeing with how DISH handled matters do not meet Plaintiff's burden of demonstrating that the proffered reason for his adverse employment action is a pretext for unlawful age discrimination.

In addition to this incident, Lynne Shawley, the Human Resources representative responsible for the East Pittsburgh location, also received a number of complaints from other employees about Abels' poor attitude in the warehouse, his treatment of the technicians and his overall gruff and belligerent demeanor. (Shawley Dep. at 68, 78-79.) Abels responds that Shawley did not document these complaints and notes that he was disciplined only twice in the nine years of his employment. (Abels Dep. at 26.)

---

[7] Plaintiff denies this statement, but Defendant has produced the written warning (Abels Dep. Ex. 15.) He also denies that the record says he yelled at Umsheld (ECF No. 36 ¶ 19), but the written warning says he did.
[8] The written warning states that "Human Resources spoke to Pete regarding the incident" and the form is signed by Ginnie Smith.

In early February 2009, Shawley met with Abels to discuss the complaints she had received and to work with him to improve his relationships with his co-workers. (Abels Dep. at 45-47; Shawley Dep. at 78.) During that meeting, Abels again complained about the smoking in the warehouse. (Abels Dep. at 45-47.) Abels contends that Shawley met with him to get him to stop focusing on the corporate fraud he had previously complained about. (Abels Dep. at 46.)

<u>The Events of February 26, 2009</u>

DISH states that, on February 26, 2009, Abels complained to General Manager Paul Pevornik about several items, including the fact that employees were again smoking near the warehouse door. (Abels Dep. at 44; Pevornik Dep. at 10-11.) After hearing that employees were smoking in a non-smoking area, Pevornik states that he immediately went outside to investigate but found no one. (Pevornik Dep. at 10-11, 16.)

Abels states that he went to Pevornik's office to ask why his computer access had been restricted, that Pevornik lied and said he knew nothing about it when Manns had previously told him that Pevornik was responsible for limiting his computer access, that Pevornik sat at his desk and smirked, that he (Abels) began to feel sick to his stomach at this time and announced that he was leaving, that Grubbs followed him out of Pevornik's office and Abels commented to him in passing that people were smoking in the non-smoking area again. (Abels Dep. at 42-44, 75.)

The parties agree that, at this point, Abels left the premises in the middle of his shift. (Abels Dep. at 50; Shawley Dep. at 26.) On his way out, Abels passed Manns in the hallway and Manns states that they had the following exchange:

> I'm like "Hey, what's going on?" Pete says, "I'm outta here." I said, "Well, what's up?" He goes, "I'm sick from smoking. I'm going home." I said "But what are you talking about?" He goes, "They're out back. They're smoking again." I said, "Well, come on in and sit down and let's talk about it." He said, "I already talked to Paul."

5

(Manns Dep. at 29.) Manns did not pursue the matter at that time because he thought that Abels had already discussed it with Pevornik. (Manns Dep. at 30.)

According to Shawley, Pevornik notified her about Abels' departure and informed her that Abels had walked off the job because he was angry and disgruntled about the smoking situation. (Shawley Dep. at 25-26, 32-33, 59.) Shawley also spoke to Manns who confirmed that Abels had left in the middle of his shift and that as he passed Manns in the hallway he said "I'm outta here." (Manns Dep. at 29-30; Shawley Dep. at 53-54; 57-58.)[9]

Abels states that he advised Pevornik and Grubbs that he was sick and had to leave; that Grubbs followed him from Pevornik's office and that it was at that time that he mentioned that people were outside smoking again; that on the way out, he saw a coworker, David Stone, and told him he was going home because he was sick; and that he passed Manns and told him he was going home sick and Manns replied "Okay, I'll see you tomorrow." (Abels Dep. at 43-44, 65-66.) Stone recalled Abels saying he was going home, but not that he was going home sick. (Stone Dep. at 10-11.) Abels notes that Shawley was not an eyewitness to what occurred. (Shawley Dep. at 73-74.)

The Decision

Shawley recommended to Pevornik that DISH treat Abels' conduct as a voluntary resignation and that DISH accept his voluntary resignation. Shawley based her recommendation on her understanding that Abels had walked off the job because other employees were smoking in the warehouse, his prior outburst regarding the smoking situation, and her experience in human resources. (Shawley Dep. at 42, 53-54, 57-58, 63.)[10]

---

[9] Defendant states that Shawley reported that Manns relayed Abels' comment about being "sick from smoking" but Shawley actually testified that Manns did not say that. (Shawley Dep. at 58.)
[10] Plaintiff denies that Shawley made any recommendation (ECF No. 36 ¶ 34), but her testimony

6

Shawley gave Manns a script to tell Abels that DISH was accepting his voluntary resignation and Pevornik then instructed Manns to call Abels and tell him what Shawley had told him, which he did. (Manns Dep. at 37-39.) Abels notes that Pevornik stated that he could not recall talking to Shawley about Abels that day, did not recall telling Shawley that Abels had resigned, could not recall any conversations with Shawley about issues Abels brought to his attention or about Abels' attitude, could not recall when he learned that Abels was no longer an employee of DISH, could not recall Abels having outbursts of anger or profanity, could not recall if he ever instructed Shawley to terminate Abels on the basis that he voluntarily left his employment, did not recall being part of any investigation Shawley did, did not recall how Manns ended up reading a prepared script to Abels saying that he had voluntarily resigned and was not to return, and could not recall if anyone ever came to him and asked what he wanted to do about Abels. (Pevornik Dep. at 9-10, 17-22, 26-27.)

Pevornik stated that Abels was a good worker and that he would not have a problem taking him back if he could. (Pevornik Dep. at 29.) Defendant denies this statement and points to Pevornik's comment that "I don't know if I could," but omits Pevornik's subsequent response that he would not have a problem taking him back. Manns stated that Abels was very good at his job and offered to give Abels a reference. (Manns Dep. at 23-24.)

According to DISH, Abels was replaced by Tina Akarman, who was about 30 years old. (Manns Dep. at 14; Def.'s Resp. Pl.'s First Set Interrogs. No. 11.[11]) Manns also mentioned Erin Sweeney (then approximately 30 years old), Carl Jones (then in his mid-twenties), and someone

---

is that her "advice" was that "we would accept [Abels' act of leaving] as his voluntary resignation." (Shawley Dep. at 42.) He also denies that there is any reference to Shawley's "experience in Human Resources" in her deposition, but she explicitly makes this reference on page 63.

[11] ECF No. 37 Ex. C.

named Trevor (also in his mid-twenties) as having been hired about the time Abels left. (Manns Dep. at 12-15.)

Procedural History

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on March 10, 2010, and the agency issued a Notice of Right to Sue Letter on August 23, 2010. (Compl. ¶ 11.)

Plaintiff filed this action on November 22, 2010. He alleges that Defendant's act of terminating his employment on February 26, 2009 constituted age discrimination in violation of the ADEA.[12] On September 30, 2011, Defendant filed a motion for summary judgment.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An

---

[12] In his complaint, Plaintiff indicated that he cross-filed his charge of discrimination with the Pennsylvania Human Relations Commission and that he would amend his complaint to include a claim under the Pennsylvania Human Relations Act upon the expiration of the applicable period for investigation. (Compl. ¶ 11(d).) However, he has not done so.

issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

ADEA Claim

The ADEA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of such individual's age if that individual is over 40. 29 U.S.C. §§ 623(a), 631(a). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981). Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987) (en banc).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

The Court of Appeals has indicated that, to state a prima facie case of age discrimination, a plaintiff must establish that he is at least 40 years of age, that he is qualified for the position, that he suffered an adverse employment decision and that he was replaced by a sufficiently younger person to create an inference of age discrimination. Showalter v. University of Pittsburgh Med. Ctr., 190 F.3d 231, 234 (3d Cir. 1999) (citation omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

9

McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

With respect to the ADEA, the Supreme Court has held that shifting the burden of persuasion is improper because the plain language of the statute requires the plaintiff to prove that the defendant took the action "because of the plaintiff's age." Gross v. FBL Financial Servs., 129 S.Ct. 2343 (2009). Nevertheless, the Court of Appeals has held that Gross "does not forbid our adherence to precedent applying McDonnell Douglas to age discrimination cases" because McDonnell Douglas does not require shifting the burden of persuasion, but only the burden of production. Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009). Nevertheless, and unlike a case brought under Title VII, "in order to demonstrate pretext under Fuentes, it is incumbent upon the plaintiff to demonstrate that age was a determinative or 'the "but-for" cause of an employer's adverse decision;' it is not sufficient to simply show that age was 'a motivating factor.'" Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 268 (W.D. Pa. 2010 (McVerry, J.) (quoting Gross, 129 S.Ct. at 2349).

Defendant argues that, assuming that Plaintiff can state a prima facie case of age discrimination, it has proffered a legitimate, non-discriminatory reason for his termination, namely, that he abandoned his job by walking off in the middle of a shift. It further argues that

10

he has failed to present evidence from which the trier of fact could conclude that this reason was a pretext for unlawful age discrimination and that age was a determinative or "but-for" cause of his termination. Rather, Plaintiff merely argues that he disagrees with DISH's business decision.

Plaintiff responds that: 1) he has presented virtually uncontradicted evidence that he told his supervisors that he was sick and under the company's sick policy, leaving during a shift after informing a supervisor of the situation is sufficient; 2) Shawley relied on secondhand information to arrive at the conclusion that he had voluntarily resigned, and she kept no records, memos or notes from the eyewitnesses she claims to have interviewed; 3) DISH previously tried to eliminate him in a RIF; 4) he was teased because he was "old"; 5) his computer access was mysteriously restricted one week before his termination; and 6) DISH failed to investigate his EEOC claim.[13]

### Defendant's Proffered Reason and Plaintiff's Evidence of Pretext

Defendant does not argue that Plaintiff cannot establish a prima facie case of age discrimination and the record would allow for this conclusion: he was over 40, was qualified for his job as a Senior Inventory Specialist, was terminated and was replaced by younger employees, including Tina Akarman, who was approximately 30 years old, and possibly other employees who were also younger. Thus, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. Defendant contends that Plaintiff left work in the middle of his shift on February 26, 2009 without obtaining permission from his supervisor and under circumstances that indicated he was frustrated about employees smoking in a non-smoking area. Defendant elected to treat this action as a voluntary resignation

---

[13] In the Introduction section of his brief, Plaintiff also mentions that DISH failed to oppose his claim for unemployment compensation even though it had the right to do so (ECF No. 35 at 6), but he does not elaborate on this argument in the body of the brief.

and did not permit Abels to return to his employment. Defendant has thus satisfied its relatively light burden of production. Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that this proffered reason is a pretext for unlawful discrimination and proceeds along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

### Plaintiff's Challenge to Defendant's Proffered Reason

Plaintiff's primary argument is a challenge to Defendant's proffered reason for his termination. Plaintiff contends that it is "unworthy of credence" that he voluntarily resigned and points to evidence, primarily his own testimony, indicating that he left work on February 26, 2009 because he felt sick and that he informed Pevornik, Grubbs, Stone and Manns that he was leaving because he felt sick. (Abels Dep. at 41, 43-44, 62, 65-66.) He contends that Defendant's witnesses do not directly contradict him, but this is not an accurate summary of their testimony. Grubbs did not recall Abels coming to Pevornik's office but can only say he "might" have been there. (Grubbs Dep. at 8.) Pevornik's only recollection of the events of that day is that Abels came to his office to complain about people smoking and that he went to investigate. (Pevornik Dep. at 10-11, 16.) Manns recalled Abels saying "I'm outta here," "I'm sick from smoking" and "I'm going home." (Manns Dep. at 29.) Manns did not testify that he understood Abels to be saying that he was sick and requesting permission to leave. In summary, at most, the evidence was ambiguous as to whether Abels was announcing that he was leaving because he was "sick" or because he was "sick from the smoking."

Plaintiff also points out inconsistencies in the testimony of David Stone: he "could not

rule out" the possibility that Abels told him he was going home sick, he might have told Abels he would be willing to testify on his behalf but then reneged on this offer, and he might have said to Abels as he was leaving that he would see him in the morning, but he now conveniently cannot recall what happened. He stated that he could not recall telling Abels later that day, when Abels was trying to reach Manns, that Manns, Pevornik and Shawley were in a closed-door meeting, and he could not recall his conversation with Abels in May 2011, yet in August 2011 he told Abels that he was not permitted to talk to Abels' attorney. (Stone Dep. at 11-17.) Plaintiff wants the Court to draw the inference that DISH "got to" Stone and made him change his testimony.

However, as Defendant observes, Stone was a Senior Inventory Specialist (Stone Dep. at 7) and thus was Abels' co-worker, not a supervisor. Thus, even if he testified that Abels told him he was going home sick, that would not satisfy Abels' responsibility to seek permission from his supervisor before leaving. Although the Court would by no means condone the actions Abels alleges (namely, that DISH put pressure on Stone to make him refuse to give testimony that would have been favorable to Abels), the Court need not resolve whether witness tampering occurred because, under the circumstances of this case, it does not change the result.

Abels can argue that DISH could have interpreted his actions that day differently, but he cannot contend that it acted unreasonably by interpreting events in the way it did. More importantly: "To discredit the employer's proffered reason … the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. Thus, even if DISH was mistaken in its conclusion that Abels had stormed out of his job in the middle of a shift because he was fed up with employees smoking in non-smoking areas, this evidence alone would be insufficient to

13

demonstrate that his termination constituted age discrimination. Nor can he demonstrate pretext by questioning the wisdom of DISH's business decision. The Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted).

Plaintiff argues that Shawley's testimony that he was terminated based on his attitude is "not worthy of credence," particularly because she did not witness the events of February 26, 2009 firsthand. Shawley stated that Abels was angry and agitated when he left, that he had attitude problems and that there had been complaints about him from technicians and others. (Shawley Dep. at 63, 73-74 78-79.) Plaintiff notes that Shawley could not name one single person who had complained about his attitude, that she had no notes of any complainants and that she could point to no documents reflecting such complaints. (Shawley Dep. at 79.)

Defendant responds that Shawley testified that she spoke to Manns and Pevornik and did not think any follow-up was necessary. (Shawley Dep. at 25-28, 35-36, 42-43, 55-58, 73-74.) In response to Abels's contention that other employees (Dwight Johnson, John Carter, John Petrovey, Mike Foringer, Lorna Charles and Justin Sirosman) left the warehouse during their shifts without incurring any consequences (Abels Dep. at 50-51, 58-63), Defendant notes that Abels has no knowledge as to the circumstances surrounding these individuals and whether they had obtained their supervisors permission prior to leaving. See Abels Dep. at 50 (as to Dwight Johnson, he was not sure); Abels Dep. at 51 (as to Carter, Abels didn't know if he had permission to leave); Abels Dep. at 62-63 (he didn't know whether Foringer, Charles or Sirosman had approval to leave early).

14

Plaintiff contends that he has direct evidence of age discrimination, citing: 1) the fact that he was the oldest employee in the warehouse (Abels Dep. at 56-57); 2) the fact that there was a move to get rid of him in 2003 that was prevented only the intervention of Manns and a woman named "Ginny" from HR (Shawley's predecessor); 3) a picture of the Muppet Grouches was given to him with his name on it and Grubbs asked if he could handle a job in the warehouse, referring to Abels as "old man" (Abels Dep. at 36-37; Pl.'s App. Ex. A[14]); 4) the fact that his computer access was mysteriously denied one week before his termination; and 5) he was replaced by younger, less qualified employees.

Defendant responds as follows: 1) the mere fact that he was the oldest employee in the warehouse is not indicative of age discrimination; 2) the fact is that there was a RIF but Abels, an older employee, was not terminated in it; 3) the Muppet cartoon was given to him "years" before his termination by a coworker, and Abels thought it was funny (Abels Dep. at 35-37), and Grubbs played no role in the decision to terminate Abels' employment so his reference to Abels as an "old man" years before his termination was a stray remark; and 4) Abels does not even allege that his lack of computer access had anything to do with his age.

Defendant's arguments are supported under the law.  First, "the mere fact that [the plaintiff] was the oldest employee in his department does not create a discriminatory inference capable of surviving summary judgment." Helfrich v. Lehigh Valley Hosp., 2005 WL 670299, at *13 (E.D. Pa. Mar. 18, 2005).  Second, Plaintiff cannot draw negative inferences from the previous RIF, because the fact is that he, and other older employees, were retained.

Third, the Court of Appeals has held that "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if

---

[14] ECF No. 35.

they were made temporally remote from the date of the decision." Brewer, 72 F.3d at 333 (citation omitted). The Muppet cartoon and the comment by Grubbs, a non-decisionmaker, both of which occurred years before the events at issue, are insufficient to demonstrate pretext. Fourth, a plaintiff's personal view that his supervisors and coworkers were "out to get him" is insufficient to establish pretext. Sarullo, 352 F.3d at 800.

Finally, Plaintiff contends that DISH failed to investigate his EEOC claim, but Shawley testified that, upon receiving it, she spoke to Manns and Pevornik again. (Shawley Dep. at 75.) Plaintiff cites the fact that Shawley did not contact him upon learning from his EEOC charge that he was contending that he left sick. However, he cites no authority that an employer must re-contact a former employee upon receiving his charge of discrimination to explore his version of the events and the Court is aware of no such requirement.

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non discriminatory reasons." Fuentes, 32 F.3d at 765. Therefore, Defendant's motion for summary judgment should be granted.

For these reasons, it is recommended that the motion for summary judgment filed on behalf of the Defendant, DISH Network Service, LLC (ECF No. 30), be granted.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections within the time specified in the Notice of Electronic Filing. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: December 15, 2011